The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Good morning, Your Honor. My name is Mark Stichel and I represent the appellant, Karen Andrews, in this appeal. The issue before the Court is whether a pen register order or a trap and trace order was the equivalent of a warrant. Mr. Andrews was sought by the Baltimore Police Department and was ultimately located by use of a cell source location information technology. When the Baltimore Police applied for the pen register trap and trace order, the text of the application did not provide fair notice to the judge that he was approving invasive technology. In the record of the case is a non-disclosure agreement that the Baltimore Police Department signed with Harris Corporation, the manufacturer of the Hail Storm technology that was used in this case. This technology was developed for military and intelligence use. It was not originally intended for use in civilian policing. Was there a separate agreement with the FBI? The agreement was with the FBI and Harris Corporation, I believe, Your Honor. The agreement itself was, yes, with the FBI and the Baltimore Police Commissioner and the State's Attorney for Baltimore City. The non-disclosure agreement specifically provided that the Baltimore Police Department and the State's Attorney should not provide information about this technology to any court. As the Court of Special Appeals of Maryland stated in its opinion with respect to Mr. Harris, the total lack of good faith by the Baltimore Police in the manner in which they sought to obtain this order clearly vitiates any argument that this document is a warrant. I would note that even Judge Blake, who found below that this was the equivalent of a warrant, was very seriously disturbed by the actions of the police. What makes it not the equivalent of a warrant? Well, one is that a warrant is supposed to seek contraband or evidence. Here, what they were seeking was information regarding Mr. Andrews' location. The warrant, the document, did not have the specificity. Since the non-disclosure agreement spoke to the execution of the warrant rather than to probable cause in the first place, what bearing does that have on the issue of this case? I mean, I can see both sides of a non-disclosure agreement. I'm not sure I would want to say that they were void as a general matter, but the probable cause here seemed to rest on matters that were not involved with the non-disclosure agreement. The probable cause spoke to whether they had the right to execute this arrest warrant. Not how they executed it. What you're talking about is how it was executed. But the basic probable cause determination speaks on whether they had the right to intercept or go after this cell phone information under any circumstances. And that's where Judge Blake was discussing. I think here, the pen register order said there was probable cause that the information was likely to be obtained by the use of a device that is relevant to an ongoing criminal investigation. However, for probable cause for a warrant to issue, there has to be probable cause to believe that contraband or evidence is located in a particular place. They're two separate matters, and here the probable cause that was alleged and was found by the issuing court was not the probable cause that is required for the issuance of a warrant. Well, why wasn't this the functional equivalent of a warrant? I mean, it identified the place to be searched. I mean, not a particular residence, but the cell phone number, which they apparently had accurately in it. The personal thing to be seized was Mr. Andrews' cell phone, and did they or did they not have probable cause with respect to those two matters, with respect to the particular cell phone to be searched, and with respect to the thing to be seized, which was a cell phone and also Mr. Andrews? Well, Your Honor, here we're talking about a search and a warrant authorizing a search, and I would contend that a cell phone is not a place. However, I would add here that, you know, one of the reasons or one of the purposes of the Fourth Amendment is... You say the cell phone is not a place, but if it identified the address of 5032 Clifton Avenue, his home is stationary and he's staying at a variety of places in an effort to elude the police. He's moving around, and the home's not going to go with him, but the cell phone will go with him. So why wouldn't the place to be searched here be the cell phone, and they did have an accurate cell phone number? Well, Your Honor, they were searching for a particular place where he was, which would be the Clifton Avenue location, and in doing that search...  That's the problem. If there is a problem, it's a lack of particularity. It authorizes a search, but it searches everybody. It didn't just search for this phone. You put a so-called hailstone device out there, what it does, it directs every phone in that whole area to that device. There's no difference that he's dropping. That's no different than other things of that nature. It's the broadness of it. Focus on that in answering Judge Wilkerson's question, because I think you're missing that key element. Well, Your Honor, and I appreciate that. As we've said in the brief, this would be the equivalent if they had opened every door in an apartment complex, which is over-general with respect to the execution of a warrant. That's what they did here, or at least we believe they did here. One of the issues that we have in the case is that we really don't even know how this technology works. Well, that's the problem. The problem is you've got this pen-registered order that does not really authorize this particular device. It has some very generalized language that brings in a device that in effect collects information or gets information from cell, directs everybody's phone in that whole area to a particular device. And then if you want to make a call, I guess it allows it to go back to the tower of it and collects and then begins to discern, as you say, the equivalent open up every door until you find the device. And the question is, does that meet the requirements of a warrant not being particularized to what you are seeking at a particular place? Well, it does not meet the specificity of a warrant. I mean, that's the whole problem here. We put the concept of the Fourth Amendment in general warrants. In colonial times, the British would just search everywhere. And that's exactly what this device appears to do. Does Andrews have standing to object to the search of the neighbor's homes or phones? Or is that a suit that's better brought by one of the neighbors or someone whose privacy interest was infringed? I'm wondering about third-party standing and whether Mr. Andrews has standing to do this. Your Honor, I think there are two kind of separate points here. One is... Why don't you ask the question? Does he have standing as to the third parties? He does not have standing as to the third parties. Does that matter? It does not matter because this goes to the general invalidity of the warrant itself because it did not have the proper specificity as to the place to be searched. In other words, are you saying the particularized requirement is not the same as Fourth Amendment standing? It's not correct. Well, the particularized requirement, they were looking for, as I understand it, was cell site location information for a particular number. They did not give, when the application of the warrant is concerned... I did not read in the warrant application a list of different cell phone numbers. There was only one cell phone number that they were interested in the cell site location information. One particular number, which was that of Mr. Andrews. That's correct, Your Honor. So isn't that particular? We're talking about the place to be searched. And as I say, this was a general search of the requirement. As I say here, the warrant itself, I believe, is invalid because of its broadness in the place to be searched. Well, are you saying that the place to be searched must... This concerns me, because are you saying that the place to be searched must, in this day and age, invariably be a residence with a street number despite the fact that people, particularly when they're eluding the police, may not be at that particular residence or even most of the time, as this was the case with Mr. Andrews? And so you are telling us that in this new day and age, we are still invariably, as a matter of law, wedded to the notion that the place to be searched under the Fourth Amendment must always be a street address and never a cell phone number. That seems to me where your comments are going. Am I correct about that? Well, Your Honor, I think there are a couple issues here. One is that Mr. Andrews was found inside a residence. And I think there... Was it his residence? He had an expectation of privacy in the residence. There was a proffer in the criminal case that he was an overnight guest in the residence. And that gives him a reasonable expectation of privacy in that residence. Well, but I'm interested in whether the place to be searched must invariably be a street address of one form or another or whether the place to be searched can ever be a cell phone. And you're telling me that it can almost never be a cell phone, but that that would never satisfy the place to be searched. And I just wonder if that isn't really out of out of sync with what's happening in the real world where people move about with cell phones. And that's just the that's just the fact of it. You haven't answered that question. Do you have to be that broad to defend your position in this case that it never could be a cell phone? Excuse me, Your Honor. He's asking you, is your position required to say that you could never search a cell phone? Is that required to... I think, yes, you can search for a cell phone. I'm not saying that. Well, it's done all the time. It's the IMED on the phone that you get from the phone company and then you search for the phone. Your problem or the problem here is that, yes, you can search for the phone, but you cannot go and collect everybody's information in the whole area and then discern where that phone is. That's searching everything. And the difference of the third party standing here, Mr. Andrews is not trying to vindicate third parties. He's trying to vindicate his own rights, which deals with an eavesdropping case of listening to everybody, but you know the particular voice and you can, after a while, you finally figure out which one it is, which the court says you can't do that. Yeah. No, I mean, that's the problem here is that everyone was searched in the neighborhood. What do you mean by everyone was searched? Well, when the device... Were conversations listened in on? We don't know, Your Honor. That gets back to one of the other issues in the case and that is whether the court should have allowed us to have discoveries to how this device works. I understand your point. I just want to know what was searched with respect to these third parties. We don't know what was searched with respect to the third parties, Your Honor, because we don't have that information. Was anything? We don't know. I mean, you've seen the nondisclosure agreement. Well, how can we just assume it? Well, there should be discoveries so we can find out, Your Honor, and I see my time is up. But that's the real problem with this case is we, for years, have been existing under this shroud of secrecy that continues to this day. And how can we properly analyze this case without the knowledge of how this thing works? Thank you, Your Honor. Thank you. Ms. Salmonson? May it please the court. Good morning, Your Honors. I'm Rachel Simonson, here with my co-counsel, Michael Redman, on behalf of the Baltimore City Police Department, former Commissioner Kevin Davis, and Detectives Michael Spanato and John Haley. Although this case involves a novel technology, really it's the fundamentals of criminal procedure that resolve the case. A search under the Fourth Amendment does not occur unless there is an invasion by the government of a reasonable expectation of privacy, and so that's where we should begin. What was Mr. Andrews's reasonable expectation of privacy? In this case, per his own complaint in this litigation, the only reasonable expectation of privacy he could claim was in his cell phone. And so for purposes of this litigation, the only search was of his cell phone. So the police can get, use a device, pull everybody's cell phone number within an area for up to 60 days searching for this individual, and that's okay? I would quibble with the way you characterize what's happening. Well, I'm characterizing it because when you get a warrant, it is the particularity required. Absolutely. It doesn't go to the standing of the third parties or anybody else. It's what is that warrant, what is this document authorizing you to do? Absolutely. And the particularity requirement goes to the place to be searched, the cell phone, and the object of the search. The cell phone is the place? The cell phone is the place, and, Your Honor. But you didn't search his cell phone. You searched an area, and you pulled numerous phones. Did you search those other phones? We did not search the other phones, and here's why, Your Honor. Is that the first time you've said that? Because you did not say that. You did not say you did not search. We didn't say it as clearly as we could have. Two responses to you. I'm certain that those phones were not searched by that Hailstone device. I want to get your answer clearly because there may be discovery, and I don't know what that device searches because there's a nondisclosure agreement. It's all across the country right now as to what that device does. What we do know it does is that when it is put in an area, it pulls everybody's cell phone. When it's trying to access a tower, it comes to that device. That's what's authorized here. Now, where does the PIN register authorize the use of a Hailstone device or anything like it? Okay, you gave me a lot to unpack. No, answer the last question. The last question is where does it say that? It says that the order authorizes police to use a cellular tracking device. It specifically authorizes them to employ surreptitious. Does the magistrate know that? Does the magistrate authorize this? Did the magistrate know that's what this was doing? It was authorizing it to use a cell tower tracking device. I do not know whether the judge knew specifically what device the police intended to use. It's not in this record. Should the judge know? The court in Dahlia has made clear that. In what? In the Dahlia case. The Supreme Court has made clear that. Totally different case. Excuse me? Totally different case. Well, what is relevant here is that the Supreme Court made clear that the government does not need to disclose a precise manner it intends to carry out the search. A lot more information in the Dahlia case than this case. This is not the Dahlia case. But could I, could I, I want to speak to what the cell site simulator does and why it's not a search of other people's phones. Go there, but first I want to talk about the PIN register. Okay. And then did it identify this device? It absolutely did identify this device. And you maintain on the general language that you give that one would be concerned that the cell tracking device, like the Hillstone, was authorized to be used. Yes. And the Maryland Court of Appeals in the Cope's decision made that same conclusion based on an application nearly verbatim. Because I think Judge Wynn raises a good point, and I just want to make sure your answer, like he does, is clear. Why, just why is, why was this not, and not a search of all the phones in the area? Now just give, I'm listening intently to what you have to say. And I will answer that question, and I want to alert you that I want to, we have sort of alternative position in response to that. But don't back it up on me. Answer that. I will, absolutely. To be, the reason why it's not a search is because there has to be information that police are obtaining. What we know about the cell site simulator, we've reproduced in our brief, we have testimony by. I'm not asking to answer the Judge Wynn question. And I am trying. He asked, was it a search of just one phone? Correct. And your answer is yes or no. No, and let me try. Because he seems to say it is. He says it is a search of one phone. It is a search of one phone. But was it a search bigger than that? No, and here's why. And I apologize, I really am trying to give you an answer. I'm not trying to be cheeky. The Supreme Court has said that to constitute a search, when police are using technology, police have to be obtaining information they would not have otherwise obtained. In this case, the only information the cell site simulator gave police, the only information it could have given police, was the location of the target phone. In this case, the phone associated with Mr. Andrews' phone number. And that's why, respectfully, Your Honor, Judge Wynn, this is not a search of every cell phone in the area. It is true that there is electronic signals that are transmitted between the cell site simulator and every cell phone in an area. But the police... Could you institute a eavesdropping device that would listen to every call, but you were looking for one particular one, and you knew the voice identification? No. Could you do that? No, Your Honor, that would be... What's the difference? Because there you're actually obtaining information. You may be only paying attention to one, but you're actually capable of hearing and getting information as to all the other voices that you hear. That's why this is not like eavesdropping. So you're saying, number one, the police didn't obtain from any other phone information that they were unlawfully barred from obtaining, that they could have obtained that lawfully in any event? What I'm saying, Your Honor, is based on what we know in this record and in the public record about cell site simulators, the police didn't know... They might have known that there were other cell phones in the area, but they didn't know the numbers. They had no idea to whom they belonged. And I would point, Your Honor, to the testimony we reproduced on pages 13 and 14 of our brief. That's Detective... Go back to my eavesdropping. I'm not there yet. I'm not satisfied. I see where you're going with it. But you're saying, in eavesdropping, you're obtaining some other information, right? The hypothetical says you're only looking for that voice. So you ignore all the rest of the voices up there. You're trying to find that voice, but in order to get that voice, you've got to do what you did here. You have to get everybody's information into the system in order to get that voice. Well, if I understand your hypothetical, if the device that they're using to eavesdrop allows them to change channels and pick up whatever conversation they want... You've got a Hailstone device. You've got a Hailstone device that diverts every phone call to that particular device. From this cell tower, it goes right here. You're not trying to get the rest of them. You are only looking in the midst of them for that one. And I'm saying the eavesdropping equipment is identified to do the same thing. Technologically, maybe it can be done. All you're doing is listening for that voice. You are not listening for anything else except for that voice. But in order to get it, you've got to do what you're doing here. You have to divert it all to come to the device. It's not a search of any of the other devices. Is there a difference in those hypotheticals? If the device, if I understand your hypothetical, only allows them to listen to the one conversation, then it's just like a cell site simulator, and they're not obtaining information. They're not seeking. It's allowed to listen to the information, but here's the same thing. They're not trying to search the other phones, but they have to have the information from the other phones. The device does, Your Honor. Because it can't just divert his phone call to that system. If it could just divert his, in other words, you put a device out there. Your scenario is you put a device out there, and that device doesn't look for anything else, and when it finds his phone, it diverts it to that. That's not what happened here. But, again, we're talking about the Fourth Amendment, so the question is, is there government invasion of the exercise? And is the particularity requirement of the Fourth Amendment that we're on? Absolutely. Because the court says if you can do this, you nullify particularity because you can knock on every door in the place. No, Your Honor, because this isn't knocking on the door, because there's nothing police are learning about those other cell phones. But you don't even need to reach the question. These are interesting questions that are ultimately academic. They're not necessary to resolve this case because Mr. Be careful calling the courts questions academic. Oh, I don't mean that in an insulting way. I want to hear this answer. I want to hear this. I think they're very interesting, of course. But I want to hear what you think is interesting. But they're not reasonable. They don't go to Mr. Andrews' reasonable expectation of privacy, and I absolutely mean no disrespect to any of the court's questions. I know you didn't. I did that tongue-in-cheek. If you only focus on just him, you would be correct. That's not the purpose of a warrant. A warrant must be particularized. You cannot issue a warrant, a blanket warrant for a search, and then once you find what you want, says, well, he can only says it for him. Well, they didn't. Again, it goes to what is a search, and it's obtaining information. They didn't obtain any information. But to get to the particularity requirement, what's required is simply specification as to the place to be searched and the object of the search. And that's identified here. Unquestionably, police identified the phone that they were targeting, the only phone about which they were obtaining any information about the location of the phone. Just saying they didn't obtain or use any information from any other phone. One thing I was interested in was that the district court opinion said there was no Fourth Amendment violation here, and it didn't reach the whole question of qualified immunity. And it seems to me that our good discussion this morning has illustrated the difficulty of navigating these very changing conditions of technology. I mean, even as we sit here this morning, the technology is changing on both ends, both the technology that criminal suspects are using to evade law enforcement and the technology that law enforcement is using to try to apprehend them. And so you have the officers here that are caught in the middle of changing technology. And they did the best they could. They didn't just avoid the court altogether. They submitted a fairly detailed application. The district court found that this was a functional equivalent of a warrant and that there was no Fourth Amendment violation. But I'm just wondering if this isn't precisely the kind of question for which qualified immunity should be granted. Because I don't know of many cases, if indeed there are any, where we have denied qualified immunity in a case where the district court actually found for the defendants on the merits. I mean, that would be quite a step. And I'm just not aware of cases that have done this. But these officers are trapped. Do they know what exactly the requirements are with this new device or what passes muster or what it doesn't? They went to a magistrate. They, as far as I know, did not obtain any conversation or whatever information from others. The district court said the PRO was a functional equivalent of a warrant. And I'm just wondering if these shifting tides of technology when officers are caught in the middle of them and don't have any clear guidelines. And there are no clear guidelines here for them to follow. None. And so isn't this kind of case just made for qualified immunity? We don't have to say that everything was fine and what they did was fine. But it was within the range of judgment that the officers were entitled to exercise. And certainly qualified immunity would apply here. We don't disagree with that. There was a claim under the Maryland state constitution as well. And so our preferred courses of the court affirmed the district court for the same reason, that there wasn't a violation of the Fourth Amendment or of the Maryland Declaration of Rights. But if we might not agree with you on that. The general point I'm interested in is when officers lack clear guidance because of swiftly changing technologies. Isn't that under both Leon and qualified immunity law a situation where they have not infinite latitude but some latitude in the judgment call they make? Yes, Your Honor. And to speak more broadly to reasonableness, which of course is the touchstone of the Fourth Amendment. Stay with Judge Wilkerson's point. Judge Wilkerson makes an interesting point. It all depends on how you frame the issue. Section 1983 is a civil rights type act. And it was brought about to address concerns where citizens would face these kinds of violations of what they contend to be constitutional violations. And it's really not so much these poor officers are doing the best they can. That's the problem. And that's why Section 1983 was put in place. Officers are given authority. They're allowed to carry guns. They're allowed to arrest. They have a lot of protections. But the citizens, the one means by which they can avoid having their rights trampled upon is Section 1983. When you think about new technologies, the Supreme Court has already spoken to that. The Supreme Court says with these new technologies that surreptitiously invade your practices, we must be on red alert. The next technology easily could be one that listens to every conversation that is in every home, ignoring the conversations but only seeking one particular conversation in there. We don't know where these technologies and when we have private entities like the Harris Corporation put out a particular device called a hailstorm. Won't even let the law enforcement people tell the court about that particular device. Who says it's just in the hands of the government, by the way? It's in the hands of all kinds of people to listen in on people's conversations and to do things. So this idea that the officers are just pitiful and they can't do anything, that's a little far-fetched in this instance because they know who this individual is. They have worked with them as a confidential informant. They even know the block he's in. If they do old-fashioned surveillance, sooner or later he's going to show up. And so the question here goes broader than that, beyond the poor officers are doing the best they can. It is going to the rights of citizens out there to avoid their privacies being invaded by ever-developing technology. That's why the Supreme Court says, no, you can't eavesdrop just on everybody. They said you can't throw a GPS on the back of a car and just fly all over the place for it. It wasn't so much the expectation of privacy as the particularity requirement under the 14th Fourth Amendment. That's a big deal here. If you can blanket search everything, including this courthouse, if you were looking for someone and that is simply just blanket search everything in this whole courthouse until you get it, that's no different than if you knock down the door of every place looking for someone in there until you find the person you want. Even though you just know that person and then you stick out, well, we were only looking for that person. We ignored everybody else we saw when we knocked the doors down. We weren't looking at them. We didn't take down any information from them. We didn't get their names. We knew who we were looking for, so we would open it up, knock down the door, look at everybody in there. The only thing we were looking for was that person. That does not work in modern technology, and this court nor any court can ignore the changing technology because if we do, we might as well throw the Fourth Amendment out the window. Well, respectfully, Your Honor, again, the device is not giving police any information, so there's no invasion of privacy. It pings every phone in that area, redirects every phone to it from that cell tower. But the practical effect is that police don't learn anything about any of those phones. They only learn about the target phone. Here's the practical effect. I want to end with this. Here's the practical effect. You're right. Even if it doesn't learn a thing, what you don't say is it could. Every phone it brings to it, it can listen to every conversation. It can get all the information. What we don't know is is it. That's the discovery that wasn't done in this case. You're right. But all we got is your word on a summary judgment situation in which the question is whether there's an issue back here to deal with it. You make the representation as though it can't do that. It absolutely can't. Based on what is in the public record and what is in, if you look at how Detective Haley testified in the suppression hearing that was reproduced in our brief, he says the only information they have is with respect to the target phone. It's like a clock. It tells them whether that signal is getting stronger or stronger, and that's it. Just briefly, if I could conclude with respectfully, I don't disagree with the purpose of a 1983 action, but as this court recognizes. The point you make is a good one. We just are entering the world of wide speculation. I can quote from my distinguished colleague. He said we're listening to every conversation in every home. We have no basis for thinking that anything like that occurred. Now, we're not just accepting the officers on blind faith on this kind of matter. In the suppression hearing, this kind of thing would come up as to what they listened to or what they didn't listen to. And then the validity of the search and the warrant would have been before a court in the suppression hearing. But the question is, on the one hand you have a suppression hearing with the suppression, and on the other hand, with a 1983 action, you're holding officers liable in damages, in damages, personally liable in damages, on the basis of speculation. And when they are without clear guides and standards, and so what we're looking for, what my distinguished colleague and I are both looking for, is going to come out in a suppression hearing. But the suppression hearing and the purposes of 1983 are somewhat different because of the damage remedy that attaches personally to officers who don't have clear guidance in the midst of this for what they're doing. And you vindicate the Fourth Amendment through suppression, and you can vindicate the Fourth Amendment in the case of clear violations or unreasonable violations of clearly established law in 1983. But the Supreme Court has said unreasonable violations of clearly established law. What the heck is clearly established here? And they're going to be held liable in damages. And that's where qualified immunity ought to kick in. What you're saying is that under the Supreme Court precedent, you don't have to deal with the constitutional violation. The court could have just really just decided, well, even if there was a constitutional violation, it wasn't clearly established. But that's a discretionary thing. The court in this case decided to deal with the constitutional issue rather than to go on that second prong of it, which my estimation is, yeah, we could go to the second prong and say it's not clearly established, but how are we ever going to be able to resolve this? By the way, this is the 1983 case. This is not the case the Maryland court held against you, at least in terms of use of the spice. Well, held against the state of Maryland. The Baltimore City Police Department was not a party to that case, of course. Baltimore, that's right. But they decided not to go forth on this thing. I don't know if that's Maryland law, but it's the state law. Here, this is a 1983 action. That's what Judge Wilkerson is getting at. And probably a little tick that it didn't just go to the second issue. Why would you even delve into this if you can skip over it as the Supreme Court has allowed it to be done? We don't have to do that. It's now before us on the constitutional issue. Well, I see my time has more than elapsed. And I'll just say we'd be happy for you to affirm on any ground, apparent on the record, for the reasons stated in our brief and those stated today. Don't go away, Counselor. My colleagues had a lot of questions. I haven't asked you any. Would you agree that the question of particularity has nothing to do with what extraneously was actually obtained, correct? Correct. It has nothing to do with what they actually looked at. Particularity is the question of what they could have in terms of the scope, correct? Correct. The place to be searched and the item or the person to be seized. We'll make sure we agree with that. Now, they had a cell phone number that was targeted, correct? Correct. And as you just said, it could tell whether that cell phone number and presumably a cell phone number is tied to a phone and a phone is tied to a person was getting closer to something, correct? Now, that means the technology would tell them what cell phone number was moving closer, correct? My understanding, and again based on Detective Haley's testimony, is that it only told them whether that specific target number was getting closer. Well, if you're diverting all calls to that fake tower, that would be several cell phone numbers, correct? Well, it is drawing. You're not a scientist and I'm not a scientist, so we have to deal with our non-science answers here. Isn't it correct, then, if you're diverting every call in that area to a false tower, and that's what it is, the technology is, when we're normally pinging upon a tower that's regionally located or whatever, it's now saying, we've got a false tower here. Anything within that is going to ping to that. And when it pings, are you telling me they don't know, they can't tell, they cannot tell the cell phone number that pinged to it? Because they couldn't. They couldn't have told. How would you know this one if you didn't know or could not know the others? Because in this one, you punch in your target number, and as Detective Haley says, it looks like a clock, and it will just tell you whether that one signal to that one phone is getting stronger or less strong. And so that's why discovery wasn't necessary in this case, because what they were asking for discovery on were things like, well, what did the officers intend to do with this order? Did they know that they were going to use a cell site simulator? Did they think that this was only authorizing a pen register? And those questions don't get to the particularity. So you're representing to the court that from that technology, they couldn't tell whether other cell phone numbers had been diverted to that tower. Is that your representation? Specific numbers. And I'm not trying to misrepresent anything. I want to be absolutely clear. No, any number. For example, I'm here, I'm in the range, my phone is now, the ping is to the false tower. You're telling me if I'm the non-target cell phone number, they can't tell that a non-cell phone number also was diverted to it? That's what you're representing to the court? It wouldn't tell you that specific non-targeted number. That's my understanding, and that's based on Haley's testimony that we reproduced in our brief. Also, some of the other judicial opinions that have addressed cell site technology, which Judge Blake references when she says, it's not like we don't know anything about cell site simulators. I would direct your Honor's attention to the Patrick case from the Seventh Circuit, for instance. It also talks about what it's capable of. And in that case, I believe they actually – Let me ask you a hypothetical. If the technology could tell the cell phone numbers of every phone that pinged to the fake tower, would that violate particularity? No, it would not violate particularity because the question is still, did they define with particularity the place to be searched, the target phone number, and the object to be seen? It wasn't a place. It was to divert every cell phone call – or not even a call. It was to divert every cell phone ping to a false tower, not even a call. Correct? Correct. We have to consider also what they were seizing here, and it was the data from – But then, Astonis, what they're seizing is not dispositive of particularity. Well, it's part of particularity, right? It's part of it in terms of the reason this is a probable cause question, but it's not dispositive as to particularity. Particularity is also the requirement that the officer identify the place to be searched, the phone in this case, and the item or the person to be seized, which in this case was the data from Mr. Andrews' phone, not data from anyone else's phone. What they were seizing was the data that would reveal that phone's location and thereby give them an opportunity. Last question. What was the range of the false – the cap, the trapping of the pings from the false tower? That, I believe, is not on the record. The order said without geographical bounds, and it's not clear. So the whole city, perhaps? Perhaps, but Mr. Andrews, we're here to – only on Mr. Andrews' 1983 action. It doesn't matter. We're here to determine whether or not there was a particularity question. But as this court recognized in Howerton, in a 1983 action, the question is not whether officers acted reasonably vis-à-vis the world at large. The question is whether they acted reasonably as against the plaintiff. That's not true. The definition is what a reasonable officer would have done in this circumstance in general, including, I thought, the protection of citizens too. Well, and we submit it was reasonable when you have a person wanted for a serious crime like attempted first-degree murder for whom police have a warrant to arrest but who is avoiding police, it is absolutely reasonable for them to go to court and obtain an order authorizing them to track his cell phone and locate him. And once they did that, they knocked on the door. They obtained consent to go in. They arrested him. They didn't do any further search until they obtained another search warrant. Thank you so much. Thank you. This counsel's argument here shows there are substantial questions about how this works. Ms. Simonson has made various kind of soft representations, suppositions, but the bottom line is we need discovery to know how this works, to answer the questions with respect to the sufficiency and the execution of the warrant and its specificity. I would direct the court to Judge Wood's dissent in the United States versus Patrick where she discusses this subject very eloquently. I would also like to address Judge Wilkinson's questions with respect to qualified immunity in Leon. This was not an issue that was raised in the case, but I believe, and I apologize if I am citing this incorrectly, but I believe under Owen versus City of Independence, 445 U.S. 622, that qualified immunity is not something that municipalities can take advantage of. Qualified immunity applies to the officers, not the municipality. For the officers' defendants here? Well, in this case, Your Honor, both the Baltimore Police Department and the officers are defendants. The officers did move for summary judgment or motion to dismiss based on qualified immunity. The court did not address those motions because it dismissed the entire case against the Baltimore. I guess if there had been any listening to conversations of any kind, that would have gone beyond the scope of the warrant, would it not? Yes. I think we would all agree with that. The scope of the warrant was as far as obtaining information that would be of use in the criminal case. As I understand, it was limited to that one cell number. Is that correct? It was, but the search itself potentially reached many cell phones. The warrant itself didn't list a bunch of other cell phone numbers. What it did was the only listed cell phone number was one, and the only cell phone for which there was probable cause to think that this would aid in the criminal investigation was one. They didn't have probable cause to believe that anybody else's cell phone was going to aid in the criminal investigation or the apprehension of anyone. The only probable cause that existed was with respect to Andrews, not with respect to anybody else. And if they had gone beyond the boundaries and started listening to other conversations or gaining information that was private and couldn't otherwise be obtained, then that would be beyond the scope of the PRA, and that itself would give rise to a 1983 action. But we don't have that here. You have problems of standing with respect to that, and the questions of pure supposition that the officers went beyond the scope of the warrant. And I come back to the point that at least as far as the officers are concerned, to hold them liable for damages when we don't even know if they did anything that exceeded the scope of their authority under the warrant. That strikes me as an adventurous step. Well, Your Honor, I make two points. One, the liability of the officers is not before the court today. The issue today is whether the Baltimore Police Department can be liable. And under Owen versus City of Independence, the city cannot take advantage of qualified immunity as a defense. But the officers are defendants, are they not? They are also defendants. Were they dismissed? Well, everyone was dismissed. I'm talking about the officers individually. They weren't dismissed prior to the resolution of the case. That's correct, Your Honor. So they would be before someone on appeal. Yes, Your Honor. But I would also argue that in this case, I don't even believe the officers can take advantage of qualified immunity. We have a situation here where it's clear from the context that they purposefully tried to mislead the state court in the issuance of the Penn Register order. If you look at the nondisclosure agreement and you look at this carefully crafted document, which they're now claiming is a warrant but is a Penn Register order, and then they salt it with a few references to probable cause kind of floating in the air. In the Cope's opinion, which counsel has referenced, the Court of Appeals of Maryland states that the Baltimore Police Department had been doing these types of PROs with respect to the sting rate since 2007. This was clearly a program that was purposefully done to keep the courts in the dark with respect to this technology and then try to have this fig leaf of a PRO and then now claim that it has somehow morphed into a warrant. I don't believe that officers engaging in this type of activity to purposefully mislead a court can claim qualified immunity. That's the problem we've got is that as we enter these new technologies, this is the first instance I've known where there's a nondisclosure agreement that essentially lets you use the results and everything, but you can't tell the court how it works. And in trying to figure out how something works, that's the whole nub of the Fourth Amendment in terms of particularity and privacy. The next thing we're dealing with most assuredly would be facial recognition. It would be all kinds of other devices that continue to invade the privacy of citizens every day. And it's not just we can make these facts as bad as we want. This guy shot and killed three people, three other drug dealers, which involved even confidential informant. Horrible facts, but the law that evolves from this applies to every citizen of the United States. It doesn't apply just to him. And so when we start fashioning out rules that, oh, yes, it's okay for officers to do this, what we've done is open the door up to say, well, you know, when it comes to your Fourth Amendment rights as a third party, you won't even know you're being searched. So it's hard for you to even challenge it in instances like this, as Judge Breger alluded to the fact that when these phone numbers are pinged to this right here, what we know, what is represented is what Officer Haley said. He says how he operated the device. He said he didn't see it. You know, they didn't see it. What he cannot say is did that device collect the data? That's the problem you've got here is you've got a device collecting data. It could have collected not only the information on the phones it's pinging, but possibly, I don't know, the technology may allow it to collect conversations or whatever. I don't know. That's not available to the officers, but that's not the point in terms of a warrant. When you go and start searching everything in a blanket way, looking for that needle in our haystack, it says, oh, yes, that's all I'm looking for is the needle. But you've got to go through the whole haystack to get it. And that can't be what the Fourth Amendment authorizes. I agree with you, Your Honor. I mean, are non-disclosure agreements invalid per se? You mean in this context or just generally? No, I'm asking you as a general matter where there is law enforcement has a tool of enforcement in the execution of a warrant that it wishes to keep confidential because there exists a danger that other people will learn of it, evade it, copy it, et cetera, et cetera, whether it can be copied, it can be evaded. There are lots of uses that the disclosure of a technology into a criminal suspect's hands. There are lots of ways in which that could be beneficial and of use. So what I'm asking you is whether non-disclosure agreements are invalid per se or is there some standard that you would like to give us as to when they are invalid and when they are not? I would say that they are at least invalid insofar as they prevent the police or the prosecutors from giving information to judges or magistrates who are signing warrants. I'm asking Judge Wilkins a question. They're not invalid per se. No, they're not. They can be used. The question is what can you do with the information you get from it? You can go in breaking someone's house illegally as a police officer. The remedy then becomes you can't use the information. But this is the 1983 action that takes it to the next step, and that is are you reliable for the constitutional violation? But the non-disclosure agreement, no one said that's invalid. But the question is what can you do with it if you're not going to tell the judge? If you can't tell the courts of this nation what it is and how this thing uses, then who? I mean, that becomes, it really gets to a separation of power situation. Who's going to know if you can't tell the judges of this court how this technology works and what it does? Not even an in-camera opportunity where you can go in the back and hear it, but you can't tell it. Then why should you be able to use it if you can't tell us how it's being used? Because we are the only thing that's between citizens and tyranny in this country. And I'm not saying that from a law enforcement. We all favor law enforcement. Every citizen, from a tax perspective, pays for the salaries of law enforcement. So law enforcement doesn't just belong to those who support them. They belong to the people. Everybody is for law enforcement. Everybody wants it. Everybody needs it. And so they are ours, and we want to protect them. But at the same time, we've got to protect ourselves. I agree. Well, thank you, Your Honor. One final thing. That's quite a parade of horribles. Well, Your Honor, the Fourth Amendment. Very vividly and dramatically portrayed. Well, Your Honor, the Fourth Amendment. I had to meet the task on the other side. I took the roof of the courtroom to come tumbling down. Well, Your Honor, the Fourth Amendment was adopted in reaction to the parade of horribles that happened under the British occupation and administration of this country. All I can say to you is, sir, watch out. The sky is falling. Indeed it is. Thank you. All right. We'll come down, greet counsel, and proceed to our next case.
judges: Roger L. Gregory, J. Harvie Wilkinson III, James A. Wynn Jr.